Case 2:08-cv-00616-JTT-KK   Document 72   Filed 10/16/09   Page 1 of 20 PageID #: 2592

RECEIVED
IN ALEXANDRIA, LA.
OCT 16 2009
TONY R. MOORE, CLERK
BY _____ DEPUTY

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

LAKE CHARLES DIVISION

| | |
|---|---|
| ELLA J. GAUTHIER | CIVIL ACTION NO. 08-616 |
| VERSUS | JUDGE TRIMBLE |
| HORACE MANN SERVICE CORP. | MAGISTRATE JUDGE KAY |

## MEMORANDUM RULING

Before the court are several motions filed by defendant Horace Mann Service Corporation ("HMSC"): a motion for summary judgment[1] as to all claims against it and two motions to strike affidavits produced by plaintiff's experts Dr. Charles Bettinger ("Dr. Bettinger")[2] and Mr. Elijah Bob ("Mr. Bob").[3] For the reasons expressed herein below, the court finds that these motions should be **GRANTED** in their entirety.

### I. BACKGROUND

#### A. Relevant Facts

HMSC offers retirement, insurance and other financial products to the education community through employees and independent insurance agents. Plaintiff, an African-American female, is an employee agent for HMSC and resides in Lake Charles, Louisiana.

Due to the economic impact of Hurricanes Katrina and Rita, HMSC reorganized its Louisiana operations in 2006 by firing nine (9) agents, including Margaret Miller, a Caucasian female, and Batson Stevens, an African-American male. The Baton Rouge agency was closed

---

[1] R. 25.
[2] R. 49.
[3] R. 65.

1

and a single Louisiana agency was created, covering the entire state. Marilyn Rousseau ("Rousseau") was chosen to be the head of this newly created Louisiana agency.

As head of the new agency which encompassed all remaining HMSC agents, including plaintiff who was not fired, Rousseau was responsible for reassigning the policies which were serviced by the terminated agents to remaining agents for all future services. Rousseau reassigned these policies to various agents in 2006. The method used by Rousseau to reassign the Miller and Stevens policies is the origin of the suit now before us. Rousseau claims that she reassigned the policies by reference to the zip code in which they were located, referring to household profiles to learn in what zip code a grouping of policies was located.[4]

Plaintiff filed a formal charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") on December 11, 2006, alleging that the reassignment of policies was based on the impermissible factors of race and gender and resulted in financial damage to her because she received a lesser quality book of business than did her Caucasian counterpart, employee agent Michael Snyder ("Snyder") of Rayne, Louisiana. Plaintiff also alleged that she was promised all policies formerly belonging to Miller and Stevens by Ron Byers and Randy Farless, both HMSC managers, but did not receive all such policies in the reassignment process. This charge was later dismissed by the EEOC and plaintiff was issued a Notice of Rights letter,[5] informing her of her right to sue on or about February 8, 2008.

Plaintiff filed the above captioned suit on May 6, 2008, alleging violations of Title VII of the Civil Rights Act of 1964[6] by HMSC based on the conduct described in her prior EEOC

---

[4] A household profile is a type of HMSC internal data which groups all existing policies by household. For example, if a single family purchased three separate types of policies or financial products from HMSC, all of these policies or products would be listed on a single household profile. See, e.g., Exhibit 4 to July 28, 2009 deposition of Dr. Charles Bettinger, attached to HMSC's motion (R. 49-3).
[5] R. 2.
[6] 42 U.S.C. §§ 2000e, et seq.

2

charge.[7] Plaintiff sought relief in the form of back wages, benefits and earnings which she claims were withheld from her by virtue of the lesser value book of business she was assigned, as well as prejudgment interest. HMSC filed its answer denying discrimination based on race or gender and denying plaintiff's damages claim.[8] This matter has been fixed for a jury trial to begin on January 19, 2010 before the undersigned in Lake Charles, Louisiana.

Now before the court is HMSC's motion for summary judgment, wherein it alleges that plaintiff is unable to establish a prima facie case of discrimination by either direct or circumstantial evidence as required by applicable law and jurisprudence. Attendant to this motion, HMSC has also moved to strike the affidavits of two (2) of plaintiff's expert witnesses, Dr. Charles Bettinger and Mr. Elijah Bob, submitted in opposition to HMSC's motion. HMSC's motion seeks summary judgment and a dismissal of all pending claims by plaintiff and is considered below.

### B. Applicable Standards

Summary judgment is appropriate only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," viewed in the light most favorable to the non-moving party, indicate that there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.[9]

A material fact is one which, given its resolution in favor of one party or another, might affect the outcome of the suit under applicable law.[10] An issue is considered "genuine" when the

---

[7] R. 1.
[8] R. 6.
[9] Fed. R. Civ. P. Art. 56(c); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249-50 (1986); American Home Assurance Co. v. United Space Alliance, 378 F.3d 482, 486 (5th Cir. 2004).
[10] Anderson, supra, at 248.

evidence leaves open the possibility that a rational trier of fact might still return judgment in favor of the nonmoving party.[11]

Once the moving party has carried its burden of showing an absence of evidence to support the non-moving party's case, the burden shifts to the non-moving party to come forward with specific facts showing a genuine factual issue for trial.[12] "Conclusory denials, improbable inferences, and legalistic argumentation" are not an adequate substitute for specific facts showing that a genuine issue of material fact remains to be tried.[13] Evidence presented, whether in support of or in opposition to a motion for summary judgment, must be of such character that it would be admissible at trial.[14] Where both parties have presented contradictory evidence, the court will resolve all such controversy in favor of the non-moving party, viewing the facts and evidence in the light most favorable thereto. General averments will not suffice, however, in place of specific factual proofs, as the court will not assume the existence of any material fact issue not pled by the non-moving party.

If the moving party fails to demonstrate the absence of material fact questions or if the non-moving party succeeds in demonstrating the existence of such fact questions, the motion for summary judgment must be denied.

Affidavits submitted in support of or opposition to a motion for summary judgment are subject to timely motions to strike.[15] Pursuant to Fed. R. Civ. P. 56(e), such affidavits must, among other things,

> ...be made on personal knowledge, set out facts which would be admissible in evidence, and show that the affiant is competent

---

[11] Hamilton v. Segue Software, Inc., 232 F.3d 473, 477 (5th cir. 2000), citing Anderson, supra, at 248.
[12] Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986); Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).
[13] SEC v. Recile, 10 F.3d 1093, 1097 (5th Cir. 1993).
[14] Fed. R. Civ. P. Art 43(a); Roucher v. Traders & General Ins. Co., 235 F.2d 423 (5th Cir. 1956).
[15] Auto Drive-Away Co. of Hialeah, Inc. v. ICC, 360 F.2d 446 (5th Cir. 1966).

to testify on the matters stated.

Thus, supporting or opposing affidavits must comply with Fed. R. Evid. 401 and 402 concerning relevancy and Rule 702 concerning expert witness testimony. Generally, only relevant evidence is admissible before the court.[16] Relevant evidence is that which tends to make the "existence of any fact that is of consequence to the determination of the action" more or less probable.[17] Fed. R. Evid. 702, concerning expert testimony provides that

> [i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based on sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Accordingly, a motion to strike may, among other things, voice objections to the relevancy or reliability of the affidavit at issue. Once a motion to strike is made before the court, the party seeking admission of the challenged affidavit must demonstrate admissibility under the above enumerated rules by a preponderance of the evidence. The court must carefully review all such evidence to ensure that only expert witness testimony which is relevant and reliable is considered by the trier of fact, be that judge or jury.[18]

Objections to form or content of affidavits submitted in support of or in opposition to a motion for summary judgment are waived if not timely made.[19]

---

[16] Fed. R. Evid. 402.
[17] Fed. R. Evid. 401.
[18] Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993); Kumho Tire Co., Ltd. V. Carmichael, 526 U.S. 137 (1999).
[19] Fed. R. Evid. 103(a)(1).

## II. ANALYSIS

### A. HMSC's motion to strike affidavits of Dr. Charles Bettinger[20]

HMSC moves to strike the affidavits[21] of plaintiff's expert witness, Dr. Charles Bettinger, on the following grounds:

(1) Dr. Bettinger's qualifications as an expert witness for the purpose of statistical analysis
(2) relevancy
(3) untimeliness

HMSC first contends that Dr. Bettinger, while certainly an expert in the field of economics, is unqualified to render the type of expert testimony contained in his affidavit and offered by plaintiff in opposition to HMSC's motion for summary judgment. HMSC points out that Dr. Bettinger has no advanced degree in Mathematics, Statistics or Probability and has not engaged in scholarly endeavors in those fields, such as publication of articles, participation in professional organizations or the teaching of those subjects at the graduate level. HMSC also points out that, when asked to name one or more cases in which he has rendered expert testimony on statistics as is proffered here, he is unable to do so, though he asserts that he has previously given such testimony. HMSC acknowledges that Dr. Bettinger is qualified to give expert testimony estimating economic damages in accidental injury and death cases, but argues that his affidavit now before the court reaches too far outside his area of acknowledged expertise.

Plaintiff refutes these allegations and contends that Dr. Bettinger is, indeed, qualified to render expert testimony opining as to whether or not HMSC's proffered non-discriminatory reason for policy allocation is pretext for some impermissible motivation under Title VII.

---

[20] R. 49.
[21] Plaintiffs submitted Dr. Bettinger's first affidavit, dated June of 2009 (R. 44-11) with its first opposition to the motion and filed Dr. Bettinger's supplemental affidavit (R. 59-2) with its memorandum in opposition to HMSC's motion to strike.

Plaintiff refers the court to Dr. Bettinger's affidavits of June of 2009[22] and August 31, 2009[23] as proof that he is well-qualified. Dr. Bettinger's curriculum vitae[24] and supplemental affidavit reveal that he possesses an undergraduate degree in Business Statistics from the University of Texas, as well as an MBA and PhD, each with an emphasis on "quantitative methods." The affidavit discloses that Dr. Bettinger taught Statistics at both the University of Texas and the University of Louisiana at Monroe ("ULM"). The affidavit further discloses that Dr. Bettinger has "worked as a statistician at the University of Texas and ULM, creating the Center for Business and Economic Research at ULM" and served as the Dean of the College of Business at McNeese State University.

It is undisputed that Dr. Bettinger has been accepted as an expert in this and other courts for the purpose of estimating economic damages. Although Dr. Bettinger has not, so far as this court knows, ever offered testimony pertaining to statistical analysis, we do not reject his proffered testimony on that basis. Assuming the truth of HMSC's allegation that Dr. Bettinger has never actually offered such testimony before, this court will permit him to offer testimony as it would any first-time expert.

HMSC next argues that Dr. Bettinger's proffered expert opinion testimony is irrelevant and should be stricken pursuant to Federal Rules of Evidence 401, 402, 702 and 703. Specifically, HMSC asserts that Dr. Bettinger, upon the advice of plaintiff's counsel, did not read the relevant portions of Marilyn Rousseau's deposition, wherein she disclosed the method she used to allocate the policies among the remaining agents. Accordingly, HMSC concludes, Dr. Bettinger's expert report is not based on sufficient facts or data. HMSC also asserts that Dr. Bettinger's report is not the product of reliable principles and methods and, because it does not

---

[22] R. 44-11.
[23] R. 59-2.
[24] Attached to June 2009 affidavit.

describe the mathematical processes used to generate his opinion, cannot possibly asssit the trier of fact in understanding evidence or determining an issue in this case.

In response to this argument, plaintiff seeks to supplement Dr. Bettinger's expert report, partly because of what it alleges are late-produced household profiles[25] which it wanted Dr. Bettinger to consider. Plaintiff offers the supplemental affidavit of Dr. Bettinger[26] which explains that "[t]he only simple statistic that was employed was a 2x2 contingency table employing Fisher's Exact Probability"[27] and that he failed to provide any of this information before because he "…was not asked during my deposition what my methodology was."[28]

Dr. Bettinger's original affidavit states that

> "[d]ata analysis clearly indicates that random selection
> of accounts assigned to Ella Gauthier from Margaret
> Miller and Batson Stevens cannot account for the assignments
> which were made. To date, no satisfactory alternative
> reason for these assignments, other than race, has been made."[29]

Our review of the remainder of the affidavit reveals that Dr. Bettinger compared the amount of commissions received by both Miller and Stevens in 2005 ($37,913) with the amount of commissions plaintiff received after the transfers and breaks this comparison into portions for each type of insurance product at issue.

The court finds several flaws in Dr. Bettinger's methodology. First, Dr. Bettinger's opinion that plaintiff incurred at least $20,050 in income shortfall as a result of Rousseau's allocation of the Miller and Stevens policies is based, at its core, on the assumption that plaintiff was entitled to receive all of those policies and, also, on the assumption that plaintiff could, if

---

[25] A household profile is a type of HMSC internal data which groups all existing policies by household. For example, if a single family purchased three separate types of policies or financial products from HMSC, all of these policies or products would be listed on a single household profile. See, e.g., Exhibit 4 to July 28, 2009 deposition of Dr. Charles Bettinger, attached to HMSC's motion (R. 49-3).
[26] Supplemental affidavit of Dr. Bettinger of August 30, 2009 (R. 59-1).
[27] Id. at ¶ 2.
[28] Id.
[29] R. 44-11 at ¶ 3.

8

given those policies, expect a minimum profit of $37,913 – the combined total of commissions paid to Miller and Stevens for these policies in 2005. We find both of these assumptions to be erroneous given the evidence before us.

Although plaintiff claims that she was told by supervisors Ron Byers and Randy Farless that she could expect to receive the entire book of business from both Miller and Stevens in the reorganization, it is undisputed that Rousseau was given unfettered authority to reassign the Miller and Stevens policies among remaining Louisiana agents.[30] Moreover, plaintiff admits that Rousseau never actually promised both books of business to her.[31] Therefore, we find it irrelevant to consider what income could have been made if plaintiff was given all of the Miller and Stevens policies and, thus, should not be the basis of Dr. Bettinger's analysis.

The court also finds the assertion that, if plaintiff had been given all the Miller and Stevens policies, she should have gained, at a minimum, the same amount of commissions from these policies that Miller and Stevens earned from them in 2005 to be erroneous. As pointed out by Dr. Arnold Levine ("Dr. Levine"), defendant's expert, the $37,913 earned by Miller and Stevens was comprised of $19,975 in "first year commissions," which are paid exclusively to the originating agent and would not be paid to plaintiff in any event.[32] Plaintiff does not dispute this in her memorandum in opposition to the motion to strike.[33] Thus, we find analysis based on the total amount of commissions paid to Miller and Stevens irrelevant as to whether or not plaintiff was discriminated against in this case.

HMSC next asserts that Dr. Bettinger conducted little or no analysis to determine whether or not its proffered non-discriminatory method of policy reassignment is pretextual. HMSC says

---

[30] HMSC's statement of material fact (R. 25-2) at ¶¶13-15; plaintiff's response to defendant's statement of material facts (R. 44-2) at ¶¶ 13-15.
[31] Affidavit of Ella Gauthier of June 10, 2009 at ¶ 5 (R. 44-15).
[32] Affidavit and attached expert report of Dr. Levine, dated August 14, 2009 (R. 49-4) at pp. 7-9.
[33] R. 59.

this is due, in part at least, to the fact that Dr. Bettinger was instructed by plaintiff's counsel not to delve into this proffered method because it "would not hold water."[34] The court has reviewed not only Dr. Bettinger's original and supplemental report, but also his various deposition testimonies and is constrained to agree with HMSC that Dr. Bettinger's failure to conduct analysis of any sort in order to determine whether or not Rousseau's explanation that, while taking care not to assign too many policies to any one agent, she assigned profiles (containing multiple individual policies) located in certain zip codes to plaintiff and those located in other zip codes to Mike Snyder, is merely pretext for racial discrimination makes his expert testimony in this case irrelevant. In order to shift the burden of proof back to HMSC in this case, plaintiff is required to produce some proof that the explanation used by HMSC is pretextual and that the real method of selection was race. Our review of Dr. Bettinger's report reveals that his opinion basically boils down to his observation that because plaintiff, an African-American female, received a great majority of policies in predominantly black schools from a former agent who was also African-American, and comparatively few policies from predominantly Caucasian schools from a former agent who was Caucasian, it must mean that the selections were based on race. Frankly, this observation does not aid the court in any way, since one need not be an expert to arrive at this hypothesis which is, quite obviously, the foundation of plaintiff's case.[35]

Based on our findings above, the court now concludes that Dr. Bettinger's original expert report and affidavit are inadmissible because they lack any indicia of the type or methods of "statistical analysis" used; they fail to consider HMSC's proffered non-discriminatory explanation for policy reassignment; they offer economic damages estimates based on faulty

---

[34] Deposition of Dr. Bettinger of July 28, 2009 at 46:10 – 47:6.
[35] See Hayter v. City of Mount Vernon, 154 F.3d 269 (5th Cir. 1998); Orthopedic & Sports Injury Clinic v. Wang Lab., Inc., 922 F.2d 220 (5th Cir. 1991).

assumptions and, therefore, do not apply reliable principles to fact. For these reasons, HMSC's motion to strike shall be granted as to Dr. Bettinger's original expert report and affidavit.

We next address the issue of timeliness as it pertains to Dr. Bettinger's proposed supplemental affidavit, attached as Exhibit 1 to plaintiff's memorandum in opposition to HMSC's motion to strike, which we have found should be granted. Our review of this proposed supplement reveals that it contains no new statistical analysis and only offers that Dr. Bettinger used a "2x2 contingency table employing Fisher's Exact Probability" in arriving at his conclusion that race is the only possible basis upon which Rousseau reassigned the policies at issue. It contains no explanation of this method, nor any information on what numbers or factors were used and is, therefore, summary in nature. The remainder of the supplemental affidavit merely defends his use of the commission reports as his data source and his economic damages estimates. As such, we find Dr. Bettinger's supplemental affidavit irrelevant because, like the original affidavit, it does not aid the court in determining issues before it. Accordingly, plaintiff's motion to supplement Dr. Bettinger's original affidavit will be denied.

### B.  HMSC's motion to strike the affidavit of Elijah Bob[36]

HMSC moves to strike the affidavit of Elijah Bob ("Bob"),[37] offered by plaintiffs as expert testimony as to direct evidence of discrimination, on the basis that its findings are irrelevant due to Bob's failure to consider the proffered non-discriminatory explanation of defendant and his flawed logic in determining economic losses. The court agrees.

Bob's expert report, dated May 22, 2009, discloses that he reviewed commission reports and compared commissions received by Miller and Stevens in 2005 with commission payments to plaintiff and Mike Snyder in 2006. We agree that this methodology fails to consider the

---

[36] R. 65.
[37] R. 69-1.

number of non-renewed policies transferred to plaintiff from either terminated agent and, further, fails to consider the impossibility of knowing whether a previously lucrative account will continue to be lucrative in the future, given clients' ability to cancel coverage or cease contributing to a financial product at will. Finally, we also agree with HMSC that Bob's expert report and affidavit fail to consider whether or not the explanation for the reallocation of policies is pretextual based on analysis. As with Dr. Bettinger's expert report and affidavits above, Bob does not offer testimony which aids the court in any way, making his proffered testimony irrelevant to the issue of pretext. While we agree with plaintiff's argument that it is relevant to the merits to consider the evidentiary gap created by the missing profiles, we do not find that Bob's affidavit is probative as to this fact, which is not denied by HMSC and may be easily shown without the necessity of expert testimony. As such, we find that HMSC's motion to strike the affidavit of Elijah Bob should be granted and that such affidavit should be stricken from the record in this case.

### C. HMSC's motion for summary judgment as to all claims against it by plaintiff[38]

Plaintiff's suit alleges discrimination based on race and sex[39] in violation of Title VII of the Civil Rights Act of 1964.[40] Title VII provides, in part, that an employer may not

> fail or refuse to hire or to discharge any individual, or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; or
>
> to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment

---

[38] R. 25.
[39] Although plaintiff's complaint references a claim based on sex, none of the briefs before the court address this issue and plaintiff has offered no proof in support of such claim.
[40] 48 U.S.C. §§2000e, et seq.

12

> opportunities or otherwise adversely affect his status as an employee because of such individual's race, color, religion, sex, or national origin[.][41]

Plaintiff alleges that she sustained an adverse employment action when she was assigned the majority of the book of business of Stevens, an African-American male, rather than the entire book of business from both Stevens and Miller, a Caucasian female. Plaintiff asserts that the former Stevens policies are worth less money than those formerly belonging to Miller. Plaintiff also alleges that she was treated disparately by Rousseau, the supervisor reassigning the policies, because the more lucrative book of business was given to Snyder, a Caucasian male.[42] Finally, plaintiff alleges that HMSC's method of reassigning policies following the termination of an agent result in a disparate impact upon women and/or African Americans.[43]

HMSC asserts that plaintiff has produced no direct evidence of discrimination and, further, is unable to demonstrate that she experienced an adverse employment action which is legally actionable under Title VII. HMSC points out that plaintiff was not fired, was awarded a significant increase in the number of policies she serviced and, as a result, experienced a significant increase in her income.

A plaintiff may demonstrate employment discrimination based on race either by direct evidence or by circumstantial evidence.[44] "Direct evidence is that which, if believed, proves the fact of discriminatory animus without inference or presumption."[45] Once plaintiff comes forward with direct evidence of discrimination, the employer may attempt to demonstrate that it

---

[41] 48 U.S.C. § 2000e-2(a)(1) and (2).
[42] R. 1 at ¶ 17. Although plaintiff's complaint does not expressly characterize her claim as a disparate treatment claim, our review of the record indicates that it is such a claim and should be analyzed as such.
[43] Id. at ¶ 20. Neither plaintiff, nor defendant have discussed this claim. Plaintiff has, accordingly, presented no evidence of disparate impact in this case.
[44] Price Waterhouse v. Hopkins, 490 U.S 228 (1989).
[45] Sandstad v. CB Richard Ellis, Inc., 309 F.3d 893, 897 (5th Cir. 2002).

13

would have taken the same action without the impermissible discriminatory animus.[46] When direct evidence is unavailable, a plaintiff may attempt to prove discriminatory treatment under the four factors enumerated in McDonnell Douglas Corp. v. Green:[47]

> 1. plaintiff is a member of a protected class of individuals
> 2. plaintiff suffered an adverse employment action
> 3. at the time of the adverse employment action, plaintiff was performing her job at a level that met the employer's legitimate expectations; and
> 4. other similarly situated employees were more favorably treated than was plaintiff.[48]

If plaintiff satisfies these four elements, the burden shifts to the employer to articulate a legitimate, non-discriminatory reason for the adverse employment action.[49] Plaintiff may, then, attempt to prove that the employer's proffered reason is merely pretext for impermissible animus.[50]

Plaintiff argues that she has demonstrated direct evidence of discrimination in the alleged statements of Rousseau, and others, as well as the statistical evidence indicating that she was assigned a disproportionate share of Stevens' allegedly less valuable policies. It is well established that

> statements or documents which show on its face
> that an improper criterion served as the basis – not necessarily
> the sole basis, but a basis – for the adverse employment
> action are direct evidence of discrimination.[51]

---

[46] Lee v. Russell County Board of Education, 684 F.2d 769 (5th Cir. 1982).

[47] 411 U.S. 792 (1973).
[48] Id.
[49] Id.
[50] Id.
[51] Fabela v. Socorro Indep. Sch. Dist., 329 F.3d 409, 415 (5th Cir. 2003).

14

Plaintiff's affidavit states that she was told by Terry Smith, a senior agent, on March 9, 2006 that "[Stevens'] clients were good enough for me, but that I just couldn't handle Margaret Miller's book of business."[52] Plaintiff's affidavit also attests that Rousseau told her, on or about March 16, 2006, that "Margaret Miller's clients did not want to have [her] as their agent and that [she] could get additional policies from across the river."[53] Plaintiff's affidavit also recounts that Spec Lewis, her immediate supervisor, told her that she "would be getting a load of policies and that [she] could not handle all of the policies which [she] would be receiving."[54] It is undisputed among the parties that Rousseau had complete and unfettered discretion to reassign the Miller and Steven policies, so we concentrate our analysis on the alleged statement of Rousseau, which she denies having made.

In Jones v. Robinson Property Group, LP,[55] the U.S. Fifth Circuit Court of Appeal reversed the district court's grant of summary judgment on the basis that plaintiff offered statements allegedly made by his employer as direct evidence of racial animus and, in the context of a summary judgment motion, the district court erred in failing to assume the truth of those statements, thereby failing to construe the evidence in the light most favorable to plaintiff as the nonmoving party. Plaintiff offered deposition testimony from a co-worker which recounted that plaintiff's employer stated "good old white boys don't want blacks touching their cards in their face" and that "maybe I've been told not to hire too many blacks in the poker room."[56] The court recounted its decision in Fierros v. Texas Department of Health,[57] wherein it held that statements

---

[52] Affidavit of Ella Gauthier of June 10, 2009 at ¶ 6 (R. 44-15).
[53] Id. at ¶ 9.
[54] Id. at ¶ 3.
[55] 427 F.3d 987 (5th Cir. 2005).
[56] Id. at 993.
[57] 274 F.3d 187, 192 (5th Cir. 2001).

15

or documents showing on their face that an impermissible factor was a basis, even if not the only basis, for the adverse employment action is direct evidence of discrimination.

The alleged statement of Rousseau does not rise to the level of direct evidence of discrimination. Unlike the statements offered in Jones, the fact-finder would have to infer that the reason plaintiff was not desired by Miller's clients is that she is an African-American, rather than because of some quality of her work or other factor. The Jones court considered statements which contained, on their face, racial animus. We find that the alleged statement of Rousseau falls far short, even if assumed to have been made as alleged, of direct evidence as it contains no racial animus on its face and requires an inference. Thus, we find that plaintiff has failed to offer direct evidence of racial discrimination.

Viewing the evidence in the light most favorable to plaintiff, we now consider whether or not plaintiff has demonstrated a prima facie case of race discrimination by circumstantial evidence. Neither party disputes that plaintiff is a member of a protected class and that, prior to the policy reassignments, she was performing her job at a satisfactory level. Thus, plaintiff successfully demonstrates two of the four McDonnell Douglas factors.

Whether styled as a direct or circumstantial evidence claim, plaintiff must demonstrate that she experienced an adverse employment action.[58] An employment action may not be speculatively adverse and, instead, must be a "serious and material change" in the terms, conditions or privileges of plaintiff's employment.[59] In the absence of a diminution in pay or benefits, plaintiff must show that the contested employment action produced "materially adverse consequences."[60] Not every employer decision that makes an employee unhappy is actionable

---

[58] McCoy v. City of Shreveport, 492 F.3d 551 (5th Cir. 2007).
[59] Davis v. Town of Lake Park, 245 F.3d 1232 (11th Cir. 2001).
[60] Brown v. Brody, 199 F.3d 446, 457 (D.C. Cir. 1999).

under Title VII. For instance, a decision of an employer which limits an employee's chances for promotion or for lateral transfer is not an adverse employment action under Title VII.[61]

Plaintiff asserts that the book of business formerly belonging to Miller was "stronger than that of...Stevens and produced more income on a regular basis," making it more desirable.[62] Quoting 2005 commission reports, plaintiff cites the disparities between the commissions paid to Miller and Stevens as evidence of this fact. For example, plaintiff claims that 108 auto insurance policies were transferred to her from Stevens and that those policies paid Stevens a total of $1085.75 in 2005, while the additional 135 policies of Stevens not transferred to her previously paid commissions of $4146.56.[63] As we noted in discussing the expert reports of Dr. Bettinger and Mr. Bob, these figures include first year commissions which plaintiff clearly could not expect to receive because she was not the originating agent. Therefore, we do not find that the comparisons based on the 2005 commission reports are evidence that plaintiff's belief that the Miller policies were better is objectively true.[64]

HMSC asserts that one need only look at the steady increase in plaintiff's yearly income to determine that she has not suffered an actionable adverse employment action. Specifically, HMSC points out that plaintiff earned $33,229.91 from HMSC in 2005, $41,642.66 in 2006, $45,966.30 in 2007 and $55,784.52 in 2008.[65] Plaintiff does not dispute these facts, but claims that her increased income is due not only to the reassignments, but also to her own hard work in generating business.[66]

---

[61] Burger v. Cent. Apartment Mgmt., 168 F.3d 875, 878 (5th Cir. 1999); Dollis v. Rubin, 77 F.3d 777, 782 (5th Cir. 1995).
[62] Affidavit of Ella Gauthier of June 10, 2009 (R. 44-15) at ¶ 13.
[63] Plaintiff's opposition to HMSC's statement of material facts (R. 44-1) at p. 23.
[64] Alvarado v. Texas Rangers, 492 F.3d 605 (5th Cir. 2007) (citing Hunt v. Rapides Healthcare Sys., LLC, 277 F.3d 757 (5th Cir. 2001).
[65] R. 25 at pp. 9-10.
[66] Supplemental memorandum in opposition to HMSC's motion for summary judgment (R. 67) at p. 9.

Having reviewed the evidence before us, we do not find that plaintiff has demonstrated an adverse employment action in being assigned a particular group of policies, even if we assume that she received 100% of Stevens' policies and 0% of Miller's policies, which neither party actually contends. Plaintiff offers no evidence that these policies generated less income once transferred to her than the more preferable policies made for Snyder, to whom the allegedly preferable policies were given. Moreover, plaintiff argues against her own case by pointing out that an agent's hard work can transform a small value account into a more lucrative one. Again, assuming that plaintiff could prove that Miller's policies, once transferred to Synder, made him more money, she would still have failed to prove that that both agents put in equal effort and got unequal results because of some inherent quality of the Stevens policies. Additionally, plaintiff's arguments fail to account for the prerogative of clients, who may choose not to continue doing business with HMSC or may reduce the size of their account at will.

The court is aware of the fact that certain zip codes within the Lake Charles area contain predominantly Caucasian neighborhoods and schools while others contain predominantly African-American neighborhoods and schools. Although the parties have been careful to avoid this line of reasoning, it is clear to the court that plaintiff's assumption is that the location of the majority of the schools Stevens' policies were derived from tends to indicate that they are smaller in value. To permit plaintiff to characterize the assignment of policies in predominantly African-American zip codes to her as an adverse employment action overlooks a myriad of factors, such as the agent's influence and client preferences, in favor of yet another unfortunate

stereotype. Moreover, this sort of subjective complaint simply does not rise to the level of an "adverse employment action" as that term has been construed by the U.S. Fifth Circuit.[67]

Although we find that plaintiff has failed to demonstrate that she was subjected to an adverse employment action, out of an abundance of caution, we now address the final factor of whether or not plaintiff has demonstrated that she was treated less favorably than similarly situated coworkers. We find that she has not. Plaintiff offers no evidence, as stated above, that once Snyder received the majority of the Miller policies, his income exceeded that of plaintiff. Again, even assuming that plaintiff could demonstrate this fact, plaintiff has offered no proof that any such increase is due to the inherent characteristics of the Miller policies. Finally, although plaintiff has failed to introduce evidence which demonstrates that she was assigned a smaller volume of policies than was Snyder and that any difference in volume is such that disparate treatment might be inferred.[68]

## III. CONCLUSION

The court finds that the affidavits and expert reports of both Dr. Charles Bettinger and Mr. Elijah Bob should be stricken from the record in this case on the basis that each fails to offer relevant testimony based on reliable principles or methods or to apply such principles or methods reliably to the facts of this case. Moreover, such reports and affidavits contain summary opinions which the court does not find aid its duty of interpreting the evidence before it in the context of this motion.

---

[67] See Benningfield v. City of Houston, 157 F.3d 369 (5th Cir. 1998) (transfer of employee to night shift, investigations and criticisms not adverse employment actions); Harrington v. Harris, 118 F.3d 359 (5th Cir. 1997) (failure to award merit pay raise does not constitute adverse employment action).
[68] The court notes that substantial disagreement exists between the parties as to the exact number of policies transferred to plaintiff in this case. This is due, in large part, to the fact that once the agent designation was changed on the household profile by Rousseau, the identity of the original agent was not able to be known. In essence, no "bread crumbs" were left to follow. For the purposes of this motion, the court assumes that plaintiff's estimates of the policies assigned to her are accurate over the numbers submitted by HMSC. For the reasons expressed above, however, we do not find that such evidentiary dispute is determinative in this particular case.

Construing the evidence before us in the light most favorable to plaintiff as the nonmoving party, the court finds that plaintiff has failed to demonstrate direct evidence of employment discrimination based on race and has further failed to demonstrate by circumstantial evidence that she experienced an adverse employment action or that she was treated less favorably than Snyder, to whom she compares herself in this litigation. Accordingly, the court finds that HMSC's motion for summary judgment should be granted and that all claims by plaintiff against it should be dismissed with prejudice.

**Alexandria, Louisiana**
**October 16, 2009**

_____
JAMES T. TRIMBLE, JR.
UNITED STATES DISTRICT JUDGE